151 So.2d 166 (1963)
Imogene SEARCY d/b/a Searcy Real Estate Company
v.
Donald JACOBS.
No. 964.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1963.
Rehearing Denied April 1, 1963.
Certiorari Refused June 4, 1963.
Philip J. Foto, New Orleans, for defendant-appellant.
Pilie, Nelson & Limes, Robert J. Landry, New Orleans, for plaintiff-appellee.
Before REGAN, SAMUEL and CHASEZ, JJ.
CHASEZ, Judge.
This is an action by a real estate agent to recover her commission in the sum of $5,070.00 for the sale of realty under a listing contract. Defendant appeals from a judgment of the District Court ordering the *167 commission to be paid, awarding plaintiff $4,650.00, together with legal interest, 25% attorney's fees and costs.
The record shows the following facts:
On December 13, 1960 Donald Jacobs, defendant and Mrs. Imogene Searcy doing business as Searcy Real Estate Company, plaintiff, entered into a written contract of three months' duration, terminating March 13, 1961, which contract granted Mrs. Searcy the exclusive right for that 90-day period to sell the house and lot owned by Jacobs located at 1734 Oriole Street in New Orleans, Louisiana, for the sum of $97,000.00. Under the terms of this contract Jacobs agreed to pay Mrs. Searcy a commission at the regular rate of 6% on the gross amount of any agreement to sell or exchange bearing on said property made during the existence of the contract, or on the gross amount of any such agreement made within 90 days after the expiration or termination of the contract, with anyone to whom said property had been quoted during the term of the contract.
Late in December of 1960 Mrs. William B. Barnett answered a newspaper ad which read substantially as follows:
"LAKE TERRACE
"Two-story colonial, 6 bedrooms, 3 full bath, 3 ½ baths, beautiful den, 10 tons air-conditioning. Big reduction in price, exquisite place.
"HU 8-8144 SEARCY HU 6-6413"
Mrs. Barnett called the number listed in the ad. In her testimony she contends she was not interested in purchasing the house at that time, but primarily was inquiring as to the size of the house, inasmuch as she wanted to compare it with a house being designed for her and her husband which they intended to build on a lot they owned in Aurora Gardens subdivision. Mrs. Barnett testified that Mrs. Searcy said that they were asking $135,000.00 for the house; that Mrs. Searcy gave her the address of the house at 1734 Oriole Street, but at that time Mrs. Barnett was not interested in buying a home; that Mrs. Searcy later called her and said that the asking price had been lowered to $110,000.00. Mrs. Barnett testified that at the time of the first conversation she assumed she was speaking to the owner of the house, inasmuch as the conversation concerned their respective children; however, when Mrs. Searcy called her again to make an appointment to see the house, she realized Mrs. Searcy was an agent, and said that she never would have given her name to Mrs. Searcy in the original conversation had she known she was not talking to the owner of the house. From the face of the ad, this contention seems untenable.
Mrs. Searcy testified that the ad described the Jacobs Oriole Street property, inasmuch as it was the only house in that area containing 6 bedrooms; that during her original conversation with Mrs. Barnett they discussed houses all over the city; that Mrs. Barnett was interested in buying a house as well as building her own home; that Mrs. Barnett asked and was given the price of the house; that she later called Mrs. Barnett several times to set up appointments to see the house, to no avail; that when she later telephoned Mrs. Barnett the latter tried to avoid her; that upon the expiration of her agency contract with Jacobs, March 13, 1961, she mailed Jacobs a list of prospective purchasers, among which was the name of Mr. and Mrs. William Barnett; that she did not know the Barnetts had a friend in the realty business, and had she known, she would have welcomed an offer in that manner.
Mrs. Barnett stated that the second time Mrs. Searcy called she told her that she was not interested in buying, and if she was, they had a friend in the real estate business and Mrs. Searcy would have to contact her if there was anything Mrs. Barnett wanted to buy. The two ladies never met.
When the Barnetts received bids on their proposed house in February or March, 1961, they decided against building their own home because of the prohibitive costs. *168 They then contacted a personal friend, Mrs. Thelma Mebbans, a real estate agent with Carriere & Harper, and requested information on any available houses for sale about the size Mrs. Mebbans knew was desired.
The Barnetts were not satisfied with the information furnished by Mrs. Mebbans, and during the first week of April, 1961, drove out to the lakefront to look at houses, although Mrs. Barnett testified that they were not "house-shopping" at that time. During the course of their drive they saw and liked the colonial-type house at 1734 Oriole Street, which house had no "For Sale" sign in front at that time. They called Mrs. Mebbans and asked if she could find a similarly typed house for them for sale. Mrs. Mebbans said she knew of a house of that type for sale in the area, and made an appointment to show the house the next day. When she met the Barnetts the next day, the house she showed them was at 1734 Oriole Street, the same house seen the day before by the Barnetts.
It is significant that this was the same address furnished to Mrs. Barnett by Mrs. Searcy, and that Mrs. Barnett testified that their drive in the lakefront area that day was to try and locate addresses furnished by Mrs. Mebbans. However, Mrs. Barnett contends that she did not connect the house with the address given her by Mrs. Spearcy when she saw it.
That same week the Barnetts made an offer of $77,500.00 on the house, which offer was accepted by Jacobs. The act of sale was passed some time later. The Barnetts are now residing in the house.
After the offer had been made to Jacobs and while acceptance was pending, Mrs. Searcy called Mrs. Barnett and asked why the offer had not come through her office, inasmuch as she had offered the same house to Mrs. Barnett four months ago. Mrs. Barnett replied that she did not want to deal through her because she had a friend in the real estate business. Mrs. Barnett testified that this was the first she knew that Mrs. Searcy had anything to do with the house.
Mrs. Searcy testified that Jacobs had allowed her to keep her sign upon the property, to advertise, and to obtain keys to show the residence after their contract of agency had expired but within the terms of the 90-day clause when the Barnetts submitted a bid on the property, which bid was accepted within the 90-day period; that she did obtain the keys to the house from the owner at Fort Pike, gave them to Mrs. Mebbans, and sat out in front of the house while Mrs. Mebbans showed the house to the Barnetts; that Jacobs said he would relist the house with her the Wednesday after Easter; that she ran her last ad in the newspaper relative to the house on April 1, 1961.
Jacobs testified that he re-listed the Oriole Street property, after the expiration of his listing agreement with Mrs. Searcy, with his sister, an agent for Carriere & Harper, for $97,500.00; that he accepted the Barnetts' offer to purchase at $77,500.00 through Mrs. Mebbans, who brought in a blank piece of paper which authorized sale of the house at a stated price, which he signed; that at the time of his signing he did not know the identity of the purchasers; that he did receive the list of prospective purchasers containing the name of the Barnetts from Mrs. Searcy; that he did not realize the ultimate purchasers were the same Barnetts whom the list stated were in the barge business; that he split the commission on the sale with his sister.
A real estate agent does not ordinarily earn his commission unless he procures a purchaser within the time fixed in his contract. The owner of real property is liable to a real estate agent for the agent's commission where the agent has procured a prospect and the owner has continued negotiations which culminate in a sale of the property, even though the transfer is not made until after the termination of the agency contract. Wright v. *169 Monsour, La.App., 86 So.2d 586; Wolf v. Casamento, La.App., 185 So. 537.
Under the terms of the written contract, Jacobs was to pay Mrs. Searcy a 6% commission on the gross amount of any agreement to sell the property made during the existence of the contract, or the gross amount of any such agreement made within 90 days after the expiration or termination, with anyone to whom the property had been quoted during the term of the contract. In Ruiz v. Kiehm Pharmacy, La.App., 37 So.2d 720 the Court held, "To quote property surely means nothing more than to offer it and to state the price asked." Under such definition and the testimony of both Mrs. Barnett and Mrs. Searcy, the statement by Mrs. Searcy in the original conversation that the owner was asking $135,000.00 for the property, as well as the subsequent call by Mrs. Searcy telling Mrs. Barnett that the price had dropped to $110,000.00, was a "quoting"; and under LSA-C.C. 1901, the terms of the contract was law to the parties thereto and Jacobs is liable to Mrs. Searcy for her commission.
But there is more here that leads us to affirm the decision of the district court: Mrs. Searcy went well beyond the scope of merely quoting the price. She advertised the property for over four months, put a sign on the lawn, talked to the ultimate purchaser, Mrs. Barnett several times, and obtained the keys to show the residence to the ultimate purchaser. She further gave the address of the property to Mrs. Barnett and told Jacobs that Mrs. Barnett was a prospective purchaser. All of these actions by Mrs. Searcy show that she continually pursued the sale of the Jacobs property to the Barnetts. Her conduct warrants a full commission under the terms of the agreement. Womack Agencies v. Fisher, La.App., 86 So.2d 732; Caruso-Goll v. LaNasa, La.App., 72 So.2d 13; Cruse v. Bruscato, La.App., 28 So.2d 56 and cases cited therein; Anderson v. City of Monroe, La.App., 2 So.2d 499; Sollie v. Peoples Bank & Trust Co., La.App., 194 So. 116; Zollinger v. Gust, La.App., 192 So. 132; Gipson v. Spearman, 186 La. 18, 171 So. 558.
For the reasons assigned, the judgment of the district court is affirmed in favor of plaintiff for $4,650.00, together with legal interest and 25% attorney's fees, defendant to pay all costs in both courts.
Affirmed.